**Kathleen V. EVANS, et al., Plaintiffs,**

**v.**

**H. Dean EVANS, et al., Defendants.**

**Civ. No. H91–216.**

United States District Court,
N.D. Indiana,
Hammond Division.

April 8, 1993.

Ivan E. Bodensteiner, and Donald J. Evans, Evans & Evans, Valparaiso, IN, for plaintiffs.

David Michael Wallman, Deputy Atty. Gen., Indianapolis, IN, for defendants.

### *ORDER*

LOZANO, District Judge.

This matter is before the Court on the Plaintiffs' Motion for Class Certification filed on August 19, 1991, the Defendants' Motion for Summary Judgment, the Plaintiffs' Motion for Partial Summary Judgment, and the Defendants' Motion to Strike Jury Demand, all filed on April 13, 1992. Being advised in the premises, the Court hereby **GRANTS** the Plaintiffs' Motion for Partial Summary Judgment and Class Certification, **DENIES** The Defendants' Motion for Summary Judgment, and **TAKES UNDER ADVISEMENT** the Defendants' Motion to Strike Jury Demand.

BACKGROUND

The Plaintiffs in this action challenge the legality of Indiana's alternative or residential service procedures, which disabled children,

whose disabilities preclude their education in state schools, must follow in order to secure residential placement in a private school.

In 1975, based on a finding that almost half of the disabled children in the United States were receiving an inadequate education or no education at all, Congress passed the Education for All Handicapped Children Act ("EHA"). 20 U.S.C. §§ 1400–1485 (1992).[1] Before passage of the EHA, as the Supreme Court has noted, many disabled children suffered under one of two equally ineffective approaches to their educational needs—either they were entirely excluded from public education, or they were placed in regular education classrooms with no assistance, left to fend for themselves in an environment inappropriate for their needs. *Board of Educ. v. Rowley*, 458 U.S. 176, 191, 102 S.Ct. 3034, 3043, 73 L.Ed.2d 690 (1982).

Today, the educational rights of students with disabilities are created and protected primarily by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* In passing IDEA, Congress found that "it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of children with disabilities in order to assure equal protection of the law." 20 U.S.C. § 1400(b)(9).

The federal government provides special education funds through IDEA to those states, such as Indiana, that choose to participate. In return, IDEA requires each state to ensure that an eligible disabled child between the ages of 3 and 21 receives a free appropriate public education ("FAPE"), 20 U.S.C. § 1412(2)(B). A FAPE encompasses special education and related services provided in the least restrictive environment in compliance with other requirements of IDEA, 20 U.S.C. § 1401(a)(18). In addition, IDEA contains extensive procedural requirements which center around the development by the local education agency of an individualized educational program ("IEP") for each disabled child, 20 U.S.C. § 1412(5)(C). The local agency must develop an IEP for each classified student and must meet at least

once a year to review and, if necessary, revise it, 20 U.S.C. § 1414(a)(5).

Indiana has enacted both statutes and regulations to assist in the development of an IEP. *See* Ind.Ann.Code § 20–1–6–1 *et seq.* (West 1988); Ind.Admin.Code Tit. 511, r. 7–3 *et seq.* (1993) (hereinafter "IAC"). An IEP is developed in Indiana through a case conference committee process. 511 IAC 7–10–3. This case conference is attended by the eligible child's parents and involved professionals, and the IEP services are generally delivered at the local school or the local special education cooperative to which the local school belongs. Once an IEP has properly been developed, it is considered "in effect" and "will be implemented as written". Answer to Question No. 3, 34 CFR Part 300, App. C.

Upon development of an IEP, Indiana requires an additional application and review process ("the Process") for certain children with disabilities and who are unable to be placed in public schools and are in need of residential placement. *See* 511 IAC 7–12–5. A substantial delay occurs between the time an eligible child is determined to be in need of a residential placement and the actual date of placement in an appropriate residential facility.

The average delay from the date an application was received by the State to the date of placement for 95 applications submitted between 1988 and September 1991, was 160 days. (Exh. C, Plaintiffs' Response to Defendants' Motion to Dismiss.) In addition, these figures do not include the additional delay between development of the IEP and submission of the application, which is five to six weeks. (Eby Dep., Attachment 2, Plaintiffs' Motion for Partial Summary Judgment.) Thus, the total delay from development of the IEP until placement is nearly 200 days.

## DISCUSSION

### *Class Certification*

Rule 23 of the Federal Rules of Civil Procedure establishes a two-step procedure for determining whether an action may appropri-

---

**1.** EHA was amended in 1990, and is now known as the Individuals With Disabilities Education Act ("IDEA"). *See* 20 U.S.C. §§ 1400–1485 (1992). When EHA was renamed IDEA, the modifying phrase "with disabilities" was substituted for previous references to "handicapped" children. 20 U.S.C. § 1400.

ately proceed as a class action. First, Rule 23(a) states four prerequisites which must be met before there is any possibility of a class action: 1) class members are so numerous that joinder of all members is impracticable; 2) questions of law or fact are common to the class; 3) claims or defenses of the representatives are typical of class members; and 4) the representatives will fairly and adequately represent the interests of the class. Fed. R.Civ.P. 23(a). In addition, once these prerequisites are met, a class action will still not be allowed unless the action fits into one of three subsections of Fed.R.Civ.P. 23(b). In the present action, the Plaintiffs seek certification under Rule 23(b)(2), which requires the Court find 1) the opposing parties' conduct or refusal to act must be generally applicable to the class, and 2) final injunctive or corresponding declarative relief is requested for the class. *See Retired Chicago Police Ass'n v. City of Chicago,* 141 F.R.D. 477, 483 (N.D.Ill.1992); Fed.R.Civ.P. 23(b)(2); 7A Wright, Miller & Kane, *Fed. Prac. & Proc.,* § 1775 at 447–48 (1986).

*Numerosity*

■■■ To satisfy the numerosity requirement, the joinder of all class members need not be impossible, but rather joinder must be extremely difficult or inconvenient. *Gomez v. Illinois State Bd. of Educ.,* 117 F.R.D. 394, 398–99 (N.D.Ill.1987). The complaint need not allege exact number or identity of class members; the finding of numerosity may be supported by common sense assumptions. *Retired Chicago Police Ass'n,* 141 F.R.D. at 484–485 (citations omitted). Additionally, in determining numerosity, the Court considers judicial economy and the ability of class members to institute individual suits. *Id.* at 485.

The Plaintiffs estimate that there are approximately 100–200 class members. Moreover, the Defendants do not dispute that the class is sufficiently large to satisfy the numerosity requirement of Rule 23(a)(1), nor is it disputed that joinder of all class members would be impractical, if not impossible. Therefore, the numerosity requirement of Rule 23(a)(1) is satisfied. *See Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986) (while there is no fixed numerosity rule, "generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors").

*Commonality*

■■■ The second requirement for class certification is that there be "questions of law or fact common to the class." Rule 23(a)(2). However, not all factual or legal questions raised in a lawsuit need be common as long as a single issue is common to all class members. *Retired Chicago Police Ass'n,* 141 F.R.D. at 485. Class actions, therefore, cannot be defeated on commonality grounds solely because there are some factual variations among the claims of individual members. *Id.* (citing *Patterson v. General Motors Corp.,* 631 F.2d 476, 481 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981)). In the present action, the issue presented by the Plaintiffs, whether the Process violates IDEA insofar as it imposes lengthy delays after development of an IEP, clearly presents a question of law common to all class members. The Plaintiffs' challenge does not require this Court to make individual determinations concerning the necessity of a residential placement. Rather, the question is simply whether the Process, which is common to all class members, violates IDEA. Accordingly, the Plaintiffs satisfy the commonality requirement.

*Typicality*

■■■ In order to certify as class, the claims of the representative plaintiffs must next be typical of the class claims. Typicality acts to insure that the interest of the named plaintiffs are sufficiently coextensive or inter-related with the interests of class members to ensure that the interests of those class members will be adequately protected in their absence. *Retired Chicago Police Ass'n,* 141 F.R.D. at 485 (citing *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982)). Typicality exists if the plaintiffs' claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [their] claims are based on the same legal theory." *De la Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983)

(quoting H. Newberg, *Class Actions,* § 1115(b) at 185 (1977)). Additionally, to meet the typicality requirement, the representatives must establish "the bulk of the elements of each class member's claims when they prove their own." *Retired Chicago Police Ass'n,* 141 F.R.D. at 485.

In the present action, the named Plaintiffs have been found eligible for a residential placement through a local case conference committee and are being deprived expedient placement due to the delays of the Process. Thus, their claims are typical of that of all class members, all of whom are required to submit to the Process. Moreover, the named Plaintiffs' claims clearly arise from the same practice or course of conduct that gives rise to the claims of other class members, as the Defendants' implementation of the Process gives rise to the claims of all members of the class. Finally, since the Plaintiffs challenge a rule of statewide application, no danger exists that the named Plaintiffs' claims will be subject to a unique defense which could destroy typicality. Therefore, the typicality element is satisfied in the present action.

*Adequate Protection of the Class Interests*

 The final requirement under Rule 23(a) is that the representatives fairly and adequately protect the interests of the class. Rule 23(a)(4). In determining whether the named Plaintiffs adequately represent the interests of the class, the Court considers two factors: 1) whether conflicts of interest exist between the representatives and the rest of the class members; and 2) whether Plaintiffs' counsel will adequately protect the interests of the class. *Retired Chicago Police Ass'n,* 141 F.R.D. at 489.

 First, as to conflicts of interest, the interests of a class representative must be wholly compatible with and not antagonistic to the interests of the class. *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.,* 572 F.Supp. 1494, 1500 (N.D.Ill.1983); *Retired Chicago Police Ass'n,* 141 F.R.D. at 459. In addition, "[a]lthough a representative plaintiff need not immerse himself in the case ... the named plaintiff must have some commitment to the case, so that the 'representative' in a class action is not a fictive concept." *Rand v. Monsanto Co.,* 926 F.2d 596, 598–99 (7th Cir.1991). The named

Plaintiffs and members of the class are both seeking to enforce their rights under federal law and, additionally, every child in Indiana found in need of a residential educational placement has a right to such a placement. Therefore, there is no conflict between the named Plaintiffs and the class members. Further, the named Plaintiffs clearly will benefit from the relief sought in this case, thus, their interests are wholly compatible with those of the class and they can be expected to vigorously pursue the litigation.

 Second, as to the adequacy of Plaintiffs' counsel, where "attorneys have been found to be adequate in the past, it is persuasive evidence that they will be adequate again." *Gomez,* 117 F.R.D. at 401. The two attorneys for the Plaintiffs have been involved in successful class litigation in the past and no reasons exists to conclude that they will not adequately pursue this case on behalf of the named Plaintiffs and members of the class.

*Rule 23(b)(2)*

 To satisfy subsection (b)(2), the Plaintiffs must show that 1) the opposing parties' conduct or refusal to act must be generally applicable to the class, and 2) final injunctive or corresponding declarative relief is appropriate with respect to the class as a whole. These requirements are both clearly satisfied in this action. First, the Defendants' conduct is generally applicable to the class because all of the named Plaintiffs and members of the class are subject to the Process, the legality of which is the subject of this case. Second, injunctive and declaratory relief are both appropriate with respect to the class as a whole became these forms of relief will prevent the State from using the Process, if found to be in violation of federal law.

Accordingly, the Plaintiffs satisfy subsection 23(b)(2), as well as the requirements of Rule 23(a), and the Court hereby determines that this case shall proceed as a class action on behalf of a class consisting of all children with disabilities, within the meaning of IDEA, in the State of Indiana, and their parents or guardians, who have been or will be found in need of a residential placement

through a case conference conducted by their local educational agency. This class certification is limited to the Plaintiffs' claim for declaratory and injunctive relief, including compensatory educational services and reimbursement for any payments made for the education of the Plaintiffs.

*Motion for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *First Wis. Trust Co. v. Schroud,* 916 F.2d 394, 398 (7th Cir.1990). The issue before the Court is an interpretation of federal and state law, so there is no genuine issue of material fact.

*Legality of the Process*

 The Plaintiffs present a narrow issue before this Court—whether the lengthy delay between the development of an IEP requiring a residential placement and the actual placement in a residential facility violates IDEA as implemented by 34 CFR § 300.-342(b)(2). This does not require the Court to become involved in determining whether any of the Plaintiffs' IEP's are appropriate, nor does it require the Court to determine the level of education appropriate for any members of the Plaintiffs or members of the class. This is true because those children who are members of the class, as well as the Plaintiffs, have already been determined to require residential placement through the IEP process. Only after the IEP calls for residential placement, will the Process be required. *See* 511 IAC 7–12–5. Thus, the Process is, by necessity, required for each of the Plaintiffs and members of the class.[2]

The question of whether IDEA permits an agency to delay the implementation of a child's IEP, is explicitly discussed and answered in the U.S. Department of Education ("DOE") regulations implementing IDEA. The applicable regulation is found at 34 CFR § 300.342(b)(2), entitled "When individualized

educational programs must be in effect", which states that "[a]n individualized education program must: ... (2)[b]e implemented as soon as possible following the meetings under § 300.343." The comment to this section explains: "[i]t is expected that a handicapped child's individualized education program (IEP) will be implemented immediately following the meetings under § 300.343" and that "there can be no undue delay in providing special education and related services to the child." The "meetings" referred to in § 300.342, which trigger the requirement that an IEP be implemented immediately, are "meetings for the purpose of developing, reviewing, and revising a handicapped child's individualized education program." In other words, a child's IEP must go into effect as soon as possible (i.e. immediately) following the development of that IEP.

Appendix C to 34 CFR Part 300 ("Notice of Interpretation") is equally explicit about the requirement for immediate implementation of an IEP. In it, the interpretive notice answers question number four, which asks, "[h]ow much of a delay is permissible between the time a handicapped child's IEP is finalized and when special education is provided?" The DOE answers:

> In generally, no delay is permissible. It is expected that the special education and related services set out in a child's IEP will be provided by the agency beginning immediately after the IEP is finalized. The comment following § 300.342 identifies some exceptions ((1) when the meetings occur during the summer on other vacation period, or (2) where there are circumstances which request a short delay, such as working out transportation arrangements). However, unless otherwise specified in the IEP, the IEP services must be provided as soon as possible following the meeting.

Despite the apparent conflict between the lengthy delays resulting from Indiana's Process, the Defendants maintain that no conflict exists, because an IEP is not "finalized"

---

**2.** Interestingly, of the 144 applications received by the State between January 1, 1988 and February 20, 1992, only 10, or less than .07 percent, were rejected by the State on the grounds that a

residential placement as unnecessary. Thus, the vast majority of IEP's requiring residential placement are simply confined by the Process.

until the state has an opportunity to review the placement through its own procedures. Defendants support this conclusion by reasoning that, because the answer to question No. 3 requires that for an IEP "to be in effect" (which the Defendants maintain is synonymous with "finalized") it must meet three tests. First, the IEP "has been developed properly"; second, that it is regarded by the parents and agency as "appropriate"; and third, it "will be implemented as written." Thus, according to the Defendants, an IEP is not "finalized" until the State agrees, through the Process that it will be implemented as written.

This argument, however, ignores the clear meaning of IDEA's implementing regulations. First, 34 C.F.R. § 300.342(b)(2) requires that an IEP must "be implemented as soon as possible following the **meetings** under § 300.343" (emphasis added). Second, the answer to question No. 4 states that "[i]t is expected that the special education and related services set out in a child's IEP will be provided by the agency beginning immediately after the IEP is **finalized** ... However, unless otherwise specified in the IEP, the IEP services must be provided as soon as possible following the **meeting**" (emphasis added). The only exceptions for delay are specified in § 300.342 and the answer to question No. 4 which are "when meetings occur during vacation periods or there are circumstances which require a short delay, i.e., transportation." The regulations did not contemplate a systematic delay, and in any event allow room for only *short* delays, unlike the Process' 200 days average delay. Thus, contrary to the Defendants' interpretation, "finalized" under answer No. 4 in 34 C.F.R. Pt. 300, App. C is synonymous with both "the meeting", also from answer No. 4, and "the meetings under § 300.343" from 34 C.F.R. § 300.342(b)(2), rather than "in effect", as the Defendants suggest. This conclusion is supported by 34 C.F.R. § 300.343, which discusses the general requirements of meetings as contemplating that "[e]ach public agency is responsible for initiating and conducting meetings for the purpose of developing, reviewing, and revising a handicapped child's individualized education program." Clearly, then, "meetings" are intended to be the equivalent of the actual development of the

IEP which occurs before a child is required to submit to the Process. Moreover, the interpretive notice also contemplates that if additional meetings are necessary they must be conducted before the IEP meeting, and thus before the child is placed:

8. Must the agency hold a separate meeting to determine a child's eligibility for special education and related services, or can this step be combined with the IEP meeting?

Paragraph (e) of § 300.532 (Evaluation procedures) provides that the evaluation of each handicapped child must be made by a multidisciplinary team or group of persons * * *. The decisions regarding (1) whether the team members actually meet together, and (2) whether such meetings are separate from the IEP meeting, are matters that are left to the discretion of State or local agencies.

In practice, some agencies hold separate eligibility meetings with the multidisciplinary team before the IEP meeting.

Note: When separate meetings are conducted, placement decisions would be made at the IEP meeting. However, placement options could be discussed at the eligibility meeting.

Other agencies combine the two steps into one. If a combined meeting is conducted, the public agency must include the parents as participants at the meeting. (*See* § 300.345 for requirements on parent participation.)

The intent of these regulations, therefore, is straight forward: An IEP must be implemented as soon as possible following the development of that IEP. Under IDEA, an IEP "meeting must be held within thirty days of a determination that the child needs special education and related services." 34 CFR § 300.343(c). So, should the State desire to become involved in the determination of a child's IEP, it must either hold meetings prior to the IEP meeting or be present at the IEP meeting. The presence of the State at the case conference committee meetings is contemplated by the regulations. 34 C.F.R. § 300.43 provides that "[e]ach public agency is responsible for initiating and conducting meetings for the purpose of developing, re-

viewing, and revising a handicapped child's individualized education program." The term "public agency" includes "the State educational agency, local educational agencies, intermediate educational units, and any other political subdivision of the State which are [sic] responsible for providing education to handicapped children." 34 C.F.R. § 300.11.

 It is well-established that under the Supremacy Clause of the United States Constitution, state laws that "interfere with, or are contrary to" federal law are invalid. U.S. Const. art. VI, cl. 2. Preemption can take one of three forms: (1) express preemption, where Congress passes a statute that by its express terms preempts state law; (2) implied preemption, where federal legislation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation, *International Paper Co. v. Ouellette,* 479 U.S. 481, 491, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987) (citation omitted), *Slater v. Optical Radiation Corp.,* 756 F.Supp. 370, 372 (N.D.Ill. 1991), *aff'd* 961 F.2d 1330 (7th Cir.1992); and (3) actual preemption, where Congress speaks neither expressly nor impliedly of preemption, but state law is nonetheless preempted to the extent that it actually conflicts with a federal statute or rule. *International Paper,* 479 U.S. at 491–92, 107 S.Ct. at 811; *Slater,* 756 F.Supp. at 372. This Court finds that the Process is actually preempted by Congress. Actual conflict arises when " 'compliance with both federal and state regulations is a physical impossibility,' or when State law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Wisconsin Public Intervenor v. Mortier,* — U.S. —, ——, 111 S.Ct. 2476, 2482, 115 L.Ed.2d 532 (1991).

Congress intended to establish a "cooperative federalism" through IDEA. *See Town of Burlington v. Department of Educ. of Massachusetts,* 736 F.2d 773, 785 (1st Cir. 1984), *aff'd sub nom. Burlington Sch. Comm. v. Department of Educ.,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The Court in *Burlington* described this concept, stating that

> compliance with the minimum standards set out by the federal act is mandatory for the receipt of federal financial assistance, (but) the act does not presume to impose nationally a uniform approach to the education of children within a given disability; it requires only that a "free appropriate education," 20 U.S.C. § 1412(i), in conformity with the state's educational standards, 20 U.S.C. §§ 1401(18), 1412(6), be provided to each disabled child upon individualized evaluation and planning."

736 F.2d at 784 (citations and footnotes omitted). Thus, IDEA does not preempt state law if the state standards meet the minimum federal guidelines. However, IDEA "does preempt state law if the state standards are below the federal minimum." *Amelia County Sch. Bd. v. Virginia Bd. of Educ.,* 661 F.Supp. 889, 893–94 (E.D.Va.1987). *See also Parks v. Pavkovic,* 557 F.Supp. 1280, 1287 (N.D.Ill.1983), *aff'd in part* and *rev'd in part,* 753 F.2d 1397 (7th Cir.1985) (finding Illinois statutory scheme which conflicted with EHA invalid under supremacy clause). Indiana's Process, which results in average delays of 160–200 days from the date of the development of an IEP, directly conflicts with 34 C.F.R. 300.342(b)(2), which establishes the federal minimum, as it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Thus, the Process violates IDEA, and is invalid and illegal under the Supremacy clause.[3]

The Defendants in this action raise several technical defenses to the Plaintiff's legal challenge. Specifically, the Defendants assert that this Court should dismiss the Plaintiff's Complaint and grant the Defendant's Summary Judgment because 1) the Plaintiffs have failed to exhaust available state administrative remedies; 2) the principles of comity and federalism counsel abstention; 3) the Plaintiffs have not demonstrated that the officials named in the Complaint are subject

---

**3.** The Defendants argue that "[t]here is nothing in the IDEA which requires a state to surrender its due process right to protect its own funding." (Defendants' Memorandum in Support of Motion to Dismiss, p. 12). However, the State of Indiana is not being asked to surrender its interest in protecting its financial resources funding. Rather, Indiana simply must comply with the federal minimum.

to damage liability, and that in any event they are entitled to personal qualified immunity; and 4) failure to join necessary parties.

*Exhaustion*

▆▆▆ Defendants assert that the Plaintiffs' claim under IDEA should be dismissed because the Plaintiffs have not exhausted their administrative remedies. On its face, IDEA requires exhaustion:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 790 *et seq.*], or other Federal statutes protecting the rights of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that it is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(f). Section (b)(2) and (c) referred to above provide:

> (2) Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State education agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.

> (c) Review of local decision by State educational agency.

> If the hearing required in paragraph (2) of subsection (b) of this section is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon completion of such review.

Section (b)(2) provides that the parents or guardian shall have an opportunity for an impartial due process hearing. Indiana has such a venue for a parent to initiate a due process hearing. *See* 511 IAC 7–15–5. The regulation provides that

> (a) A parent, a public agency, or the state education agency may initiate a due process hearing regarding:

>> (1) the eligibility of a student for services under this article;

>> (2) the appropriateness of the educational evaluation;

>> (3) the appropriateness of the student's proposed or current program or placement; or

>> (4) any other dispute involving the provision of a free appropriate public education for the student.

On its face, this provision would seem to apply to this case, because this dispute involves the provision of a free appropriate public education for a student. However, subsection (s) of this section provides that "[c]lass action due process hearings are not permitted. If the parties agree to a simultaneous hearing involving two (2) or more students, a separate decision with specific findings of fact, conclusions of law, and orders, if necessary, shall be written for each student." It is thus clear that the Plaintiffs in this case cannot initiate a due process hearing because although they are parents, they represent a class of plaintiffs. Furthermore, § 1415(f) and by incorporation subsection (b)(2), mandates only that parents or guardians must exhaust their claims through an impartial due process hearing, and does not speak to class actions which challenge the validity of State regulations. For these two reasons, it is not necessary, nor is it possible for the Plaintiffs in this case to exhaust their remedies under Indiana law.

*Abstention*

▆▆▆ Defendants argue that this Court should abstain from deciding the issue of whether the Process violates federal law. In support of this assertion, the Defendant's rely on *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746 (1971) and its progeny. In *Younger*, the Supreme Court held that federal

courts should dismiss suits raising constitutional challenges to criminal proceedings that are ongoing in state courts. *Id.* at 45, 91 S.Ct. at 751. *Younger* abstention is based on the relationship between the federal and state judiciaries: the need for federal courts to trust state courts and avoid interfering with them. The Court has since applied the *Younger* principle to prevent federal courts from interfering with state administrative proceedings involving important state interests. *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 628, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986) (court should not enjoin noncriminal state administrative proceedings where important state interests are involved); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

Defendants' reliance on the *Younger* abstention doctrine, however, is misplaced. *Younger* abstention applies to federal courts when there are state administrative proceedings "so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim." *Ohio Civil Rights Comm.,* 477 U.S. at 627, 106 S.Ct. at 2723. The Plaintiffs in this case are not now subject to a custody order of the state court, and there are no pending state administrative proceedings. IDEA vests this Court with jurisdiction to hear this cause which is all that is necessary. *See* 20 U.S.C. § 1415(e)(2).

*Immunity*

■ In their Complaint, the Plaintiffs request this Court to award compensatory and punitive damages against Indiana officials in their individual capacities pursuant to 42 U.S.C. § 1983. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As interpreted by the Seventh Circuit, "a qualified immunity analysis entails a purely objective inquiry to determine whether, at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context presented." *Polenz v. Parrott,* 883 F.2d 551, 554 (7th Cir.1989). In this case, the Plaintiffs challenged the legality of Indiana's review and application process which applies only to students requesting residential placement. In essence, they are challenging the law, as opposed to an individual's actions regarding the handling of the Plaintiff's respective cases. The individuals sued in this case were merely executing the regulations which were binding on them and passed by the Indiana State Board of Education. The individual Defendants had no role in passing said regulations, nor have they had any personal involvement in the handling of the Plaintiffs' cases. Although this Court has held that the process is illegal because it conflicts with IDEA, the Court must find that based on these facts these individual Defendants are shielded from liability for civil damages because they reasonably could have not known that in executing these illegal regulations they would violate an individual's clearly established statutory or constitutional rights. *See Singer v. Wadman,* 595 F.Supp. 188, 288 (C.D.Utah 1982), *aff'd* 745 F.2d 606 (10th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 785 (1985) (school superintendent entitled to qualified immunity for initiating prosecution under compulsory attendance law); *Mazanec v. North Judson—San Pierre School Corp.,* 614 F.Supp. 1152, 1158–59 (D.C.Ind.1985), *aff'd,* 798 F.2d 230 (7th Cir.1986) (school superintendent in charge of locating school age children which might not be complying with mandatory school attendance was immune for reporting violation to prosecuting authorities who then proceeded to initiate prosecution).

*Joinder of Necessary Parties*

■ Defendants contend that the local school corporations responsible for providing special education services where each Plaintiff resides is a necessary party to this action pursuant to Fed.R.Civ.P. 12(b)(7). The Court is not persuaded by the Defendants' argument. The Plaintiffs in this case challenge the validity of an Indiana law via a class action. It is unnecessary to join the local school where each Plaintiff resides because the residence of the Plaintiffs is imma-

terial. Moreover, the Plaintiffs have sued the Indiana Department of Education, which is the state education agency that has ultimate responsibility for Indiana's compliance with IDEA. Accordingly, this Court finds that the local schools involved are not necessary parties to this action. ·

## CONCLUSION

Based on the above, the Court hereby **GRANTS** the Plaintiffs' Motion for Partial Summary Judgment and Class Certification, **DENIES** The Defendants' Motion for Summary Judgment, and **TAKES UNDER ADVISEMENT** the Defendants' Motion to Strike Jury Demand. The Plaintiffs are hereby **ORDERED** to file a memorandum of law detailing what relief is requested, if any, in connection with ·this order (i.e. damages, injunction, etc.) within ten days from the date of this order. The Defendants are **ORDERED** to file a response to the Plaintiffs' Memorandum within twenty days from the date of this order. As the Plaintiffs have not responded to the Defendants' Motion to Strike Jury Demand, the Plaintiffs are hereby **ORDERED** to do so in the above-mentioned memorandum within the time allotted.